Christian, J.
This is a supersedeas to a decree of the Circuit court of Culpeper county.
The record discloses the following facts, which are necessary to be stated in order to a proper application of the legal questions we are called upon to consider:
On the 4th day of November, in the year 1847, Marshall Ashby, cf the county of Fauquier, conveyed by deed, executed on that day, a certain tract of land lying in that county, containing three hundred and twenty-nine acres, to Wellington W. Cocke and Daniel F. Cocke, trustees, to be held by them for the use of the *456 wife and children of the grantor. Under this deed the wife, Mrs. Lncv Ashby, was entitled to the rents, issues and profits of the land during her life; and at her death it was to be sold and the proceeds equally divided among his children : provided the children at that time should be of the age of twenty-one years; hut if not, then the land was not to be sold until the youngest child then living should arrive at the age of twenty-one years; and in the meantime the rents and profits to be applied to the support and maintenance of the children.
In December 1854 Marshall Ashby, the grantor in the above-mentioned deed, having departed this life, and John W. Ashby, one of the cestuis que trust named in said deed, having qualified as guardiaiUof his infant brothers and sisters, the said John ~W. Ashby, in his own right and as guardian of said children, filed his bill in the Circuit court of Fauquier county, in which it was alleged, among other things, that since the death of Marshall Ashby his widow and her children had resided on the land conveyed by him to the Cockes as trustees; but that the proceeds of its cultivation had not been adequate to the proper maintenance and education of the children; that the expenses of the family were necessarily increasing as the children grew older, and that the same inadequacy was yearly becoming greater; that the children had no other estate or property whatever except their interest in this land; that, under these circumstances, it was the common desire of all the family to have the land sold and an investment made of the proceeds elsewhere, where land is cheaper and the costs of living less expensive; that the land lay in a neighborhood where real estate ruled high, and that, owing to the fact that John Marshall of Mai’kham, who owned an adjoining farm, wished to enlarge his real estate, it could be then disposed of for a high price; that in fact a con *457 tract' for the sale of the land had been entered into by-all the parties interested and the said Marshall, by which he agreed to pay for it the sum of fifty dollars per acre, in payments partly in cash, and with interest on the deferred payments from the time possession should be delivered to him. This contract was filed with the bill, and it was insisted that the interests of the infants and all others interested would be greatly promoted by a sale and confirmation of the contract already made with Marshall.
To this bill the trustees and the other cestuis que trust were made parties defendants. They all answered, and all concurred that the interests of all the parties -would be promoted by a sale, and united with the plaintiffs in asking the court to confirm the contract of sale with Marshall. Such proceedings were had in this suit (which is known iu the record before us as the case of Ashby v. Ashby) that on the 20th of September 1855 a decree was entered directing a special commissioner to make sale of said land at public auction upon the following terms : Six thousand dollars of the purchase money to be paid in cash, $3,000 of the residue to be paid on the 1st April 1856, one-half the remainder to be paid on the 1st April 1857, and the balance on the 1st April 1858 — the whole of the deferred payments to carry interest from the 1st day of October 1855. Upon these terms the land vras sold by Special Commissioner Zeph. Turner to John Marshall, who fully complied with the terms of the decree.
Some time after the sale to Marshall (the exact date does not appear), there was filed iu the suit of Ashby v. Ashby, in the Circuit court of Fauquier, a petition signed by Mrs. Ashby and her children (together with the husbands of those of the daughters who were married), setting forth that “ since the institution of said suit John *458 W. Ashby, acting for himself and other parties interested, had purchased a tract of land lying in Culpeper county, lately the property of John Marshall, dec’d, containing six hundred acres, at the price of $>20 per acre; that the purchase was made for the benefit of all the parties interested in the said trust estate, and to be held in the same manner, upon the same conditions and limitations, and for the same purposes, said trust estate was. held by the trustees "Wellington and Daniel Cocke; that all the parties concerned deemed thepui’chase a judicious and advantageous one, and they prayed that the same should be ratified and confirmed by the court.
On the 18th September 1857 the Circuit court of Fauquier entered its decree, confirming the report of Commissioner Turner, who had made sale of the Fauquier land to John Marshall, and directing him to execute and deliver a deed to Marshall whenever the whole of the purchase money should be paid by him; also substituting John W". Ashby as sole trustee in the place of Daniel and "Wellington Cocke. In said decree were the following provisions: “And it appearing to the court, from said petition and affidavits, that the purchase of said tract of land, situated in the county of Culpepei’, made by the said John W". Ashby for the benefit of all the parties interested in the trust estate sold under the decree entered in this cause on the 20th day of September 1855, is a judicious and advantageous one to all concerned, doth adjudge, order and decree that the said purchase be confirmed, and that the payments made by the said John W. Ashby and the said Commissioner .Zeph. Turner out of the proceeds of the real estate (sold under said decree), on account of the purchase money of said land be also confirmed. * * * And the court doth further adjudge, order and decree that the said John W. Ashby, who is hei’eby appointed sole trustee in lieu of *459 the defendants Daniel F. Cocke and Wellington W. Cocke, do, when the balance of the purchase money of the said Culpeper land is paid, cause to be conveyed to him, by a proper deed of conveyance, the said land, to be held by him as such trustee, under the same trusts and limitations and for the same purposes declared and set forth in the deed of conveyance from Marshall Ashby to the said Daniel F. and Wellington W. Cocke, exhibited with plaintiff’s bill.”
It will thus be seen that the Culpeper land was formally accepted by the Circuit court of Fauquier as a proper investment of the trust funds arising from the sale of the Fauquier land; and the Culpeper land was to be held upon the same trusts as the Fauquier land: that is, to the sole use of the said Lucy Ashby, during her life, and at her death to be sold and the proceeds equally divided between the children of the said Marshall and Lucy Ashby, according to the terms and conditions of the deed of November 4th, 1847. Shortly after this arrangement was made, Mrs. Ashby removed with her family to the Culpeper farm, where she resided several years. John W. Ashby, her son and trustee, resided with her and had the general management and superintendence of the farm.
On the 26th April 1859, a written agreement was en • tered into between Mrs. Lucy Ashby and her son, the said John W. Ashby, by wtlieh she agreed to convey to him her life estate in said tract of land, upon the consideration that he should qiay to her annually the sum of six hundred dollars during her natural life; and should also qiay off all the debts and demands existing either against the said Lucy Ashby or the said trust estate. Appended to this agreement or endorsed thereon -was a further stipulation that the said Lucy Ashby should live with the said John W. Ashby, and keeqi with her her *460 unmarried daughters free from all charge for board; and if she should become dissatisfied with this arrangement she should then have the right to call upon the said John W. Ashby for the principal sum of $10,000, to be otherwise invested for her.
It appears that this agreement was never carried into effect by John W. Ashby, who neither paid the debts due from Mrs. Ashby and the trust estate, nor the annuity of $600 to Mrs. Ashby. But it appears from the record that John W. Ashby sold this Culpeper land to one Granville S. P. Triplett in 1863, and that Ashby and wife, on the 21st July 1863 executed a deed, conveying said land to Triplett, aud describing it as “a tract or parcel of land lying in the county of Culpeper, sold by F. Lewis Marshall, acting as commissioner of the Circuit court of Culpeper, in the cause of “F. Lewis Marshall, guardian of the infant children of John Marshall, dec’d, v. Ann G. Marshall and others,” to the said John "W. Ashby, and now in possession of said Ashby, containing 635-J- acres, in consideration of the sum of $60 per acre, &c. Triplett afterwards sold the same land to Briscoe, the appellant in this suit.
It becomes necessary to refer here to the proceedings in the suit of Marshall v. Marshall, referred to in the above deed. It seems that there were certain proceedings in the Circuit court of Culpeper, in which F. Lewis Marshall, who filed the bill as guardian of the infant children of John Marshall, was directed, as commissioner of the court, to sell at public auction the tract of land in the bill and pi’oceedings mentioned. He accordingly made sale of the same, and John W. Ashby, being the highest bidder, became the purchaser. He complied with the terms of the sale, paid down the cash payment, and executed his bonds, wdth Lucy Ashby as security, for the deferred payments. The sale was reported to *461 the Circuit court of Culpeper and confirmed by that court, and the commissioner directed to collect the bonds as they became due. He did collect the whole of the purchase money, except the sum of $98.96, and a full statement of his account was reported to the court without exception. This report was returned on the 10th November 1858. It seems that no further proceeding was taken in this cause until 15th June 1866, when the petition of Lucy Ashby ivas filed, to be noticed hereafter.
It is a conceded fact in the cause, that the purchase thus made by John W. Ashby was the same which was reported to the Circuit court of Fauquier as having been made for Mrs. Ashby and her children, and with the trust fund arising from the sale of the Fauquier Land. It is also a conceded fact that John ~W. Ashby was not known to Commissioner Marshall, or to the Circuit court of Culpeper, as dealing in that purchase with trust funds. There is nothing in the suit of Marshall v. Marshall, in the Circuit court of Culpeper, to show that John W. Ashby was making the purchase with funds that did not belong to Mm, or that the money which he paid was not his. Me, not as trustee, but in his own right, was reported to the court as purchaser, and the sale was regarded, both by the commissioner and the court, as made to him. The purchase money, with the exception of the comparatively small sum of $98.96, was all paid by him as the purchaser recognized by the commissioner and the court; and no doubt if he had paid the whole of the purchase money the court would have directed a deed to be made to him. But it must also be taken, as before observed, as a conceded fact in the case, that not a dollar paid by John W. Ashby was his money, but was the trust money belonging to Mrs. Ashby and her children; and that the purchase thus made by him was, in fact, *462 reported to tlie Circuit court of Fauquier as the disposition made of the trust fund, and was accepted by the court as a valid investment of the fund arising from the Fauquier land.
The further proceedings necessary to be referred to in the suits of “Ashby v. Ashby” and “Marshall v. Marshall” wore had after the close of the late war. The ease of Ashby v. Ashby was removed to the Circuit court of Culpeper, and the two cases then heard together.
On the 15th November 1866 Mrs. Lucy Ashby filed her petition, setting forth the execution of the trust deed by her husband Marshall Ashby, by which the property therein conveyed was settled upon her and her children, the sale of that property through the proceedings referred to in the suit of Ashby and Ashby in the Circuit court of Fauquier, the investment of the purchase money in the Culpeper land, the contract which she entered into with her son John W. Ashby, the failure of John W. Ashby to comply with its terms in any particular. She further alleges that she has been informed that John ~W. Ashby sold the land during the war to one Triplett, and that Triplett sold the same to one Briscoe, wdio now holds possession of the same. She insists, in her petition, that her rights are not affected by the sale of John ~W. Ashby to Triplett nor by Triplett’s sale to Briscoe, Ashby never having any title to said land. She asks that Ashby, Triplett and Briscoe may be required to answer her petition, and that the contract between her and Ashby may be set aside and the possession of the land returned to her; and asks for an account of rents and profits of the land since it has been out of her possession.
Before any proceedings wrere had under this petition John W. Ashby filed his amended bill in the Circuit •court of Culpeper, to which the suit of “Ashby v. Ashby ” had been removed, setting forth the former proceedings *463 in that suit, the sale of the trust property, and the investment of the proceeds in the Culpeper land, and averred further “ that some time in the year 1863 he sold and conveyed the said Culpeper land to one Granville S. P. Triplett and placed him in possession of said land; which sale he felt authorized to make under a contract between himself and the said Lucy Ashby.” He exhibits with his bill the contract referred to, and asks that Triplett, and the purchaser from him, Briscoe, may be made parties defendant, “in order that the rights of all the parties may be ascertained and properly adjusted.”
In May 1867 Mrs. Lucy Ashby and her children filed in the same cause a cross bill, in which they set out with much particularity all the proceedings in the two suits of “Ashby v. Ashby” and Marshall v. Marshall, above referred to. After setting out the agreement between John W. Ashby and Mrs. Lucy Ashby, the cross bill proceeds: “ Your complainants further show that up to the time of this agreement (26th April 1859) the said John W. Ashby lived with his mother upon the same farm, as the superintendent of the business of the farm; but after the agreement he exercised control over it and used it as his own, and lived upon it until after the commencement of the late war, in 1861, the said Lucy Ashby residing with him for a short time. But after the war commenced the said John W. Ashby entered the military service of the Confederate States; and the said Lucy Ashby had to seek board and a home elsewhere. Your complainants further show, that the said John W. Ashby has never paid one cent of the annuity, nor one debt against the said Lucy Ashby or the said trust fund, and has not furnished board for the said Lucy Ashby and her unmarried daughters; that he is now totally insolvent, «unable to pay a dollar of the annuity, or in any way *464 fulfill his part of said contract; that the property he had was all lost during the war. Your complainants further that the said Lucy Ashby has no means of supp0r£ excep£ her interest in said tract of land, and has *'or last f°ur or five years been living upon the bounty of her sous-in-law.”
After setting out the sale of the land by John W. Ashby to Triplett, and by Triplett to Briscoe, they proceed : “ Your complaiuants insist that as they purchased with the knowledge that John W. Ashby had no legal title and could convey none, they must be held to such title only as John W. Ashby had.” After making Ashby, Triplett and Briscoe parties defendants to this cross bill, they pray “that the said coutract between John "W. Ashby and Lucy Ashby may be set aside, and that the said tract of land may be restored to the possession of the said Lucy Ashby, and be held subject to the provisions of the deed from Mai’shall Ashby to "W". D. and L>. F. Cocke, and as soon as the pui’chase money is fully paid may be conveyed, as required by the decree of the Circuit court of Fauquier made in September 1857.”
This cross bill was answered by John W. Ashby, Triplett and Briscoe. Ashby admits all the allegations of the cross bill; admits that he has not complied in any particular with his contract with his mother; that he has paid no part of the annuity he agreed to pay, nor has paid any of the debts against her, or the trust fund, nor furnished board and maintenance to her and her unmarried daughters, as he agreed to do. He says: “ This respondent thought at the time (he entered into the contract with his mother) that his pecuniary circumstances were such as to enable him to pay the annuity to the said Lucy Ashby, and to buy out the interest of her children in said land, and thus perfect the title of the said Trip *465 lett. The results of the war reduced this respondent to poverty, and he can neither fulfill his obligation to Mrs. Lucy Ashby or perfect the title to Triplett.”
Triplett and Briscoe both answer, and claim that they are purchasers for valuable consideration without notice. They both deny that they ever heard of any claim of Mrs. Ashby and her children; that they had neither actual nor constructive notice that the land was subject to any trust or incumbrance in favor of Mrs. Ashby and her children. Triplett, with much detail, avers that he used the greatest diligence to ascertain the state of .the title; that he employed counsel for that purpose, who infoi’med him that the proceedings in the suit of “ Mai’shall v. Marshall ” were all regular, and that all the purchase money except a small sum (less than a hundred dollars) had been paid, and that the pui’chaser, John W. Ashby, wa3 entitled to a deed as soon as the balance was paid; that there was nothing in the papers in that suit to put him on enquiry as to any outstanding equitable title or other incumbrance. Both plant themselves upon the position of bona fide purchasers without notice, and claim the protection of a court of equity.
The two causes of “ Ashby v. Ashby” and “Marshall v. Marshall” came on to be heard together on the 13th November 1868, when the court, disposing of the whole controversy, among other things decreed that “ within thirty days after being served with a copy of this decree the said William D. Briscoe” (the last purchaser and now in possession of said tract of land) “ may elect to hold the said land for and during the life of Mrs. Lucy Ashby, provided he will assume and take upon himself all the obligations entered into by John W. Ashby in the agreement aforesaid of the 26th April 1859, and the addition thereto of the 2d May 1859, so far as the same have not been fulfilled and pei’formed by the said John *466 W. Ashby. And if the said Briscoe shall fail to make such election within the time aforesaid, then the said Triplett, within thirty days after he has been served with a copy of said decree, may elect to hold the laud for the time, in the manner and upon the terms prescribed in respect to the defendant Briscoe.” It was further decreed “that if the said Tripled and Briscoe shall both decline to make the election aforesaid, or shall fail to make it, in the mode and within the time prescribed for them respectively, then, immediately after the expiration of the time within which the said Triplett is authorized to make such election the said Briscoe shall surrender possession of said land to Mrs. Lucy Ashby or her authorized agent; and if on demand made the said Briscoe shall fail or refuse to do so, then the sheriff of the county is directed to give such possession of said land to the said Lucy Ashby or her agent.”
The court further directs (in the failure to make an election) an account of rents and profits, and reserves the question as’to the right of either Triplett or Briscoe to claim compensation for permanent improvements.
From this decree an appeal was allowed to this court.
The case has been argued in this court very elaborately, and with much learning and ability on both sides.
The counsel for Mrs. Ashby and her children have rested the claims of the appellees mainly on the ground that as Triplett purchased confessedly only an equitable ■title, he therefore purchased subject to the prior equity ■of Mrs. Ashby and her children, according to the maxim, •“ que prior est in tempore,potior est injure.” The counsel for the appellant reply to this view, that, as against subsequent purchasers for valuable consideration without notice, the registry acts of this State avoid all unrecorded contracts or deeds selling or conveying the equitable as *467 well as those which purport to sell or convey the legal title.
The appellant therefore insists that he (with Triplett under whom he claims) occupies the high position, always a favorite of a court of equity, of a purchaser for valuable consideration without notice.
The first question we are to consider is, whether the case made by the record is one which comes within the meaning of the registry act.
The 4th and 5th sections of ch. 117, Code of 1860, are as follows:
“§ 4. Any contract in writing made in respect to real estate or goods and chattels, in consideration of marriage, or made for the conveyance or sale of real estate, or a term therein for more than five years, shall from the time it is duly admitted to record he, as against creditors and purchasers, as valid as if the contract was a deed conveying the estate or interest embraced in the contract.
“§ 5. Every such contract, everydeed conveying any such estate or term, and every deed of gift or deed of trust or mortgage conveying real estate or goods and chattels, shall be void as to creditors and subsequent purchasers for valuable consideration without notice, until and except from the time that it is duly admitted to record in the county or corporation wherein the property embraced in such a contract or deed may be.”
Uow, as between John W. Ashby (who was substituted trustee in the place of the Cockes, the original trustees) and the cestuis que trust, (the appellees,) it cannot be said there was any such contract as is referred to in the sections above quoted, nor any deed or deed of trust or mortgage respecting real estate. The title of the cestuis que trust was founded on the deed conveying certain real estate to the Cockes, as trustees, by the husband and *468 father, Marshall Ashby, the subsequent sale of that real estate by regular proceedings in the Circuit court of Fauquier county, and the decree cf said court directing that the proceeds of sale should be invested by the commissioner of said court in certain lands lying in Culpeper county. The same decree directed that whenever the whole of the purchase money of the Culpeper land was paid, then John W. Ashby, the substituted trustee, “ should cause to be conveyed to him by proper deed of conveyance, the said land to be held by him as such trustee, under the same trusts and limitations and for the same purposes declared and set forth” in the deed from Marshall Ashby to the Coches. But the whole of the purchase money never was paid, a balance being still due to this day, and consequently no deed was ever made, or could be made, to John W. Ashby. What was there, then, to be recorded ? — -what contract in writing, what deed or other evidence of title, legal or equitable, which could have been put on record in the county of Culpeper? John W. Ashby had received no conveyance; he did not have in fact the legal title, and no semblance of a legal title. All he had was an apparent equitable title founded on the fact that he appeared, in the record in the suit in Culpeper, to have paid nearly all the purchase money. But the legal title was outstanding, and could only vest in him when the whole of the purchase money was paid; and then only for the pm-poses of the trusts created by the deed from Marshall Ashby to the Coches.
What evidence of title was there in the cestuis que trust which is required to be or could be made a matter of record under the registry act ? Certainly there was no “ contract in writing respecting real estate;” nor was there any deed of gift or deed of trust or mortgage conveying real estate, out of which the title of the appel *469 lees arose, and which, under the registry acts, is required to be recorded.
Their title to the Culpeper land arose out of none of these, but out of the regular proceedings of a court of equity having jurisdiction of the subject matter and the parties.
That court held in its hands funds belonging for the most part to infants and married women. These funds were derived from a sale of trust property, being real estate lying in the county of Fauquier, which funds the court had directed its commissioner to invest in lands lying in Culpeper; and when the whole of the purchase money was paid the said land was to be held by a trustee for the appellees upon certain trusts and conditions. I repeat, the title of the appellees was founded upon these proceedings of a court of chancery. Does the registry act require that these proceedings shall be made matter of record in any county where the commissioner of the court may purchase land for an investment of this fund — if so, what part of these proceedings? The decrees only, or the bill, answer, exhibits and depositions ? — all of which are necessary to show the title of the appellees. Must these all be spread on the deed books of Culpeper ? The title of the appellees is not within the terms of the registry act, and is not such a title-as is required to be recorded by that act.
For do the 1st and 8th sections of chapter 186, Code 1860, which declare that “ a decree for land shall have the effect of a judgment, and that no judgment shall be a lien on real estate as against a purchaser thei’eof for valuable consideration without notice unless it be docketed,” apply to the case before us. Fone of the decrees in the suit of “Ashby v. Ashby” can be said to be “decrees for land” within the meaning of the statute. ’They were decrees directing the sale of land held in *470 trust, and the investment of the fund arising from such sale in other lands, to be held upon the same trusts when the prarchase money was fully paid. It was not a suit settling a controversy inter partes and decreeing the land to one of them; but it was a suit to sell land about which there was no controversy as to the title, and to reinvest the fund in other land about which there was no controversy. The decrees simply first directed a sale of the one tract, and confirmed the investment made hy the court’s commissioner in another tract as judicious and proper, and directed how it should be held when the prarchase money was paid. While these decrees were certainly decrees respecting land, they cannot be said to-be decrees for land, within the meaning of the statute.
In my opinion this case does not come either within the provisions of the act requiring a registry of titles,, nor of that requiring a judgment to be docketed. But the appellant’s counsel invoke the aid of the statute in reference to the record of a Us pendens, and insist that they are protected as purchasers of the Culp>eper land by the failure of the appellees to follow the provisions of the 5th section of chapter 186, Code of 1860, in not recording a memorandum of the Fauquier suit in the clerk’s office of the County court of Culp>ep>er.
That section provides that “ no lis pendens or attachment against the estate of a non-resident shall bind or affect a prarchaser of real estate without actual notice thereof unless and until a memorandum setting forth the title of the cause, the general object thereof, the-court in which it is pending, a description of the land, and the name of the prarson whose estate is intended to be affected thereby, shall be left with the clerk of the court of the county or corporation in which the land is situate, who shall forthwith record the said memorandum *471 in the deed book, and index the same by the name of the person aforesaid.”
Flow, what was the Us pendens of the Fauquier case ? Certainly not the Culpeper land. Thai was not the corpus or subject of controversy. The title to that land was not embraced in “the general object” of the Fauquier suit. That general object was the sale of land in Fauquier and the investment of the proceeds in other lands. And who were the “ person or persons whose estate is intended to be affected thereby? ” FTo one residing,:, in Culpeper, or in any way connected with the Culpeper land, but the cestuis que trust, the Ashbys, and no one else. They were the persons whose “ estate was intended to be affected” by that suit; and the sale of their land lying in Fauquier county was the subject of the suit. Suppose they had complied literally with the requirements of the 5th section, and put upon record the lis pendens of the Fauquier case. That record would simply have been as follows: “Flame of parties: ‘Ashby v. Ashby;’ general object of the suit: sale of the real estate conveyed by Marshall Ashby to trustees for the benefit of Mrs. Lucy Ashby and her children, and the investment of the pi'oceeds in other real estate; persons whose estate is to be affected thereby: Mrs. Lucy Ashby and her children.” Row, how could such a memorandum (a literal compliance with the 5th section) have given any information to any human being of the claim of the Ashbys to the Culpeper land? This very statement shows that the doctrine of Us pendens has no application to such a case.
“ The rule as to the effect of a lis pendens,” as was said by Judge Green in Newman v. Chapman, 2 Rand., 102, “ is founded upon the necessity of such a rule to give effect to the proceedings of courts of justice. ‘Without it the administration of justice might in all cases be frus *472 trated by successive alienations of property which was the object of litigation pending the suit, so that every judgment or decree would be abortive where the recovery of specific property was the object.”
Its whole object is to keep the subjects in controversy within the power of the court until the decree is entered, and to prevent further suits for the same subjects. Judge Brooke, in French v. Loyall Co., 5 Leigh, 671. It enables the court to hold in its hand the corpus or subject of controversy, and prevent its alienation until it can be disposed of, and it can only affect a purchaser of t¡ie subject in controversy from a party to the suit. French v. Loyal Co., 5 Leigh, 627.
In no possible view of the case can it be held that the Culpeper land, (purchased by Triplett and afterwards by Briscoe) was the subject of controversy in the Fauquier suit, or that the title to that land was in any way connected with the “general object” of that suit. There was therefore no obligation on the Ashbys to file with the clerk of the County court of Culpeper the lis pendens of the Fauquier suit, and if it had been filed it would not have given notice to any purchaser of the Culpeper land, because that land was not the subject of controversy in the Fauquier suit.
But it is argued that the Ashbys ought to have given notice of their equitable claim to the Culpeper land by filing their petition in the suit of “ Marshall v. Marshall,” asking that the deed be made to them, as their money had been paid for the land; and that if this had been done everybody would have been notified that the land was purchased with their funds, and this would have prevented the purchase of Triplett from John W. Ashby, who had no title.
Why should they file such petition? The decree in the Fauquier suit had already directed that when all the pur *473 chase money was paid for the Culpeper land, a conveyance of the land should be taken by John W. Ashby, as trustee, to be held by him upon the same trusts as were set out in the original deed creating a trust estate from Marshall Ashby to the Cockes. What is there in the record to show that there was any reason to suspect, upon the part of these cestuis que trust, (most of whom were married women and infants,) that this decree would not be carried out in accordance with its terms ? But if there was any obligation on them to file such petition, when was it to be filed? Was it not their privilege to file it at any time before the money was all paid and a conveyance ordered ? If that was their privilege (as I certainly think it was) they have complied with every reasonable requirement, by the proceedings which they took in the Culpeper court before the purchase money was fully paid, and before a conveyance of the land was directed by that court.
The appellant in this case can only succeed by maintaining this high ground, that he and Triplett, under whom he claims, are purchasers for valuable consideration without notice. Ho party can occupy a higher ground than that in a court of equity; and if he can maintain that position his title is established and his position impregnable. But let us now trace the source of his title. From lohom did Triplett purchase? And what title did his vendor have or pretend to convey ? He bought of John W. Ashby. It is conceded Ashby never had the legal title; nor did he have the equitable title. He had only an apparent equitable title. That is, he (Ashby) appeared on the record of the suit of “ Marshall v. Marshall” as the purchaser, who had paid nearly all the purchase money of the land sold by decree of the court in that suit. Triplett, therefore, succeeded to the rights of Ashby, his vendor, he taking nothing more, nothing *474 less, than was in Ashby. Eow, suppose this was a controversy between these cesiids que trust and Ashby, is it possible that the Culpeper court would, after the facts had been known, decree a conveyance to him? Those facts were, that every dollar of the purchase money he had paid was trust funds which a father and husband had been careful to secure to his wife and children. It must be conceded that the court could not and would not have decreed a conveyance to John "W. Ashby. Uow,. can his unwarranted sale to Triplett prevent the court from decreeing a conveyance to the parties justly and equitably entitled to receive it? Triplett and Briscoe must stand in the shoes of John 'W. Ashby. Admit that they knew nothing of the relation between John "W. Ashby and the appellees; that there was nothing in the record of the case of Marshall v. Marshall to inform.' them of that relation, or that John W. Ashby had paid for the land with trust funds and not his own, or even to put them upon enquiry as to the real state of the title. Conceding all this, yet there was one thing they did. know: They knew the legal title ivas outstanding. They knew’ they wrere purchasing only an equitable title; they knew they were purchasing a title under the control of a court of equity, and took upon themselves the risks and hazards which always attend such a title. The purchaser of such a title cannot occupy the position of a bona fide purchaser without notice. The fact that the legal title is outstanding is of itself notice to him of the-risks which he assumes by becoming the purchaser of a. mere equity, and he takes only what his vendor can convey himself or that which he (the vendor) can call upon, a court of equity to convey to him; and his rights are governed by the maxim “nemo phis juris in alienum transferre potest quam ipse habet.”
Slow, it must also be conceded that while John W. *475 Ashby appeared ou Me record of the suit of “Marshall v. Marshall” as th„ purchaser of the land sold under a decree of the court, the moment it was known to the court that he was not the real purchaser, but that the funds lie had paid belonged to his cestuis que trust, that court would have decreed a conveyance of this land to them and not to him. How does the transfer of a pretended title from him affect the rights of the parties, or control in any way the power of the court in ordering a conveyance to the cestuis que trust, when, before the purchase money is all paid, and before the time comes when it is necessary and proper to order a conveyance, it appears that in point of fact the purchase money is paid by him in trust funds secured to the appellees?
If the contest here was between John W. Ashby and the cestuis que trust, the former could not stand for one moment in a court of equity. His vendor is in no better situation. He stands in his shoes. He gets the title of his vendor and nothing more. If his vendor has neither the legal nor equitable title, his deed conveys nothing. If he has the apparent equitable title only, and no right to call for the legal title, his vendee has no such right, and he must stand or fall by the title of his vendor, which he knew when he purchased it was dependent upon a court of chancery to convey the title, lie buys subject to the power of the court, and holds whatever title he gets “subject to the equities upon it in the hands of his vendor, and has no better standing in a court of equity.” 3 Sugden on Vendors, 350-51 and note.
The appellant in this case cannot put himself in the high position of a purchaser for valuable consideration without notice. This court has settled that question against him. In the case of Mutual Assurance Society v. Stone and others, 3 Leigh, 218, 236, President Tucker *476 says: “The rule is unquestionable, that he who would protect himself as a purchaser without notice must show himself to be a complete purchaser. If, therefore, either his purchase money remains unpaid, or he has not completed his title by obtaining a conveyance before he has received notice, the notice will affect him; for if he receive that notice before both of those acts are perfected, he ought to stop until the equity is enquired into, or- he will be bound by it. Thus, although he has paid every cent of his purchase money, and the hopeless insolvency of his vendor would prevent his ever recovering it hack, yet, if he has not completed his title by getting a conveyance prior to his notice of the prior equity he must stop, and will not be permitted to go on to secure himself by obtaining the legal title from the common vendor. And this is in strict consonance with justice and in strict analogy with equitable principles. It rests upon the maxim, which prevails in equity as well as at law, Qui prior est in tempore potior est in jure, where two equities are equal the prior equity shall prevail.”
In Vattier v. Hinde, 7 Peters’ R., 252, 271, Chief Justice Marshall said: “ The rules respecting a purchaser without notice are framed for the 'protection of him who purchases a legal estate and pays the purchase money without knowledge of an outstanding equity. They apply fully only to the purchaser of the legal estate. The purchaser of an equity is bound to take notice of any prior equity.”
So Mr. Justice Story, in speaking of the defence ,of a bona fide purchaser without notice, says (1 Eq. Juris., sec. 64, c. 1st): “The purchaser, however, must in all cases hold a legal title or be entitled to call for it in order to give him a full protection of his defence; for if his title be merely equitable then he must yield to a legal and equitable title in the adverse party.” So also in sec. *477 1502, 2d Story Eq , the same author says: “To eutitle himself to this protection the purchaser must not only be bona fide and without notice and for a valuable consideration, but he must have paid the purchase money. So he must have purchased the legal title, and not be a mere purchaser without a semblance of title; for even the purchaser of an equity is bound to take notice of and is bound by a prior equity, and between equities the established rule is that he who has the prior equity in point of time is entitled to the like priority in point of right.”
In Adams’ Equity (6th Amer. ed.), p. 340, note 1, in which are collected numerous authorities, it is said: “ The prevailing doctrine in the United States is, that the purchaser of an equitable title takes it subject to all prior equities.” See also 4 Dessan R., 274; 3 Ired. Eq. R., 117; 7 Cranch R., 48; 7 Peters’ R., 252; 10 Peters’ R., 177; 10 How. U. S. R., 185; 11 Serg. & Rawle, 389; 7 Penn. St. R., 165; id., 347. And the same author, referring to the leading case of Bassett v. Nosworthy, says, p. 34: “It appears to be clear, upon the authorities both in this country and in England, that among equal equities the prior in time, whether it be original or intermediate, is the prior in right.”
The reason of the distinction between the purchaser of a legal and equitable interest seems to be that the protection accorded to bona fide purchasers is a departure from the general rule of jurisprudence, which holds that no man can transfer a greater right than he possesses, and regards the vendee as standing in the same position as the vendor under whom he claims. This exception was made by equity against the rights and remedies which it had called into being, and in favor of purchasers who bought in good faith, and under the impression that they were acquiring a good legal title. But when the purchase is of a mere equity which owes *478 its existence to a court of chancery, and cannot be enforced without its assistance, the reasons for departing from the general maxim “nemo plus juris in alium transferre potest quam ipse habet,” is at an end, and the right acquired by the vendee is necessarily limited to that of the vendor. When, therefore, a purchaser buys an equitable estate or interest with a knowledge of its real character, and without obtaining a legal title, he can found no claim on the mere fact of the purchase, and must stand or fall by the title of the vendor. 2 Lead. Ca. in Eq., 95, and eases there cited. So it was declared in the most unequivocal manner by Ch. J. Marshall, in Shines v. Craig, 7 Cranch R., 34-48, that the purchaser of an equitable title takes it subject to all existing equities; and he relied on this doctrine in the subsequent case of Vattier v. Hinde, 7 Peters’ R., 252, above quoted, as a reason for refusing to protect the defendant as a bona fide purchaser for value. In Chew v. Barnett, 11 Serg. & Rawle, 389, Ch. J. Gibson said: “When it is asserted that a purchaser for valuable consideration takes the title free of every trust or equity of which he has no notice, it is intended of a title perfect on its face; for every purchaser of an imperfect title takes it with all its imperfection on its head. It is his own fault that he confides in a title which appears defective to his own eyes, and he does so at his peril. Bow, every equitable title is incomplete on its face. It is in truth nothing more than a title to go into chancery to have the legal estate conveyed, and therefore every purchaser of a mere equity takes it subject to every clog that may lie on it, whether he has had notice or not. But the purchaser of a legal title takes it discharged of every trust or equity which does not appear on the face of the conveyance, and of which he has not had notice, either actual or constructive.”
In addition to the cases above cited I will only refer to *479 two recentEnglish decisions which seem strongly to affirm the principles announced in 1he numerous cases above referred to. In Phillips v. Phillips, decided in 1862 and reported in Law Journal 1862 (Vol. XL. Equity) p. 321-326, the Lord Chancellor says: “ How, I take it to be a • clear proposition, that every conveyance of an equitable interest is an innocent conveyance; that is to say, the grant of a person entitled in equity passes only that which he is entitled to in equity, and nothing more. If, therefore, a person seized of an equitable estate, the legal •estate being outstanding, makes an assurance by way of mortgage, or grants an annuity, and afterwards conveys the whole estate to a purchaser, he can only grant to the purchaser that which he has, namely the estate, subject to the annuity or mortgage, and no more. The subsequent grantee takes ouly that which is life in the grantor. Hence, grantees and incumbrancers claiming in equity take and are ranked according to the dates of their securities; and the maxim applies qui prior est in tempore potior est injure. The first grantee is potior, that is potentior. He has a better and superior, because a prior equity. The first grantee has a right to bo paid first, and it is quite immaterial whether the subsequent incumbrancers at the time they took their securities and paid their money had notice of the first incumbrance or not.”
Another English ease decided in 1863 is very apposite, and the reasoning of Lord Justice Turner applies with much force to the case before us. He says : “Questions of priority between equitable incumbrancers are in general governed by the rule qui prior est tempore potior est jure; and in deténnining cases depending on the rule we must of course look at the principle on which the rule is founded. It is founded, I conceive, on this principle, that the declaration of a trust vests an estate and .interest in the subject matter of the trust in the person *480 in whose favor the trust is created or declared. When, therefore, it is sought to postpone an equitable title created by declaration of trust, there is an estate or interest to be displaced. A vested estate or interest ought not to be displaced on any light grounds. The .case which is here alleged is this,” (and in this respect much resembles the case before us,) “that the defendant Thomas Eyers, acting for himself and other members of his family, trusted everything to Sadlim, permitted him to deal with the mortgage and the moneys secured by it as he thought fit, and created and recognized an apparent oioner&hip in him, and that they ought not, therefore, to be allowed to claim against third parties wrho dealt with him bona fide upon the faith of his apparent title. But upon the ground that there was no proof that the defendants were in any way privy to or cognizant of the dealings of their trustee, it was held that their equity was not to be postponed to those who dealt with him bona fide upon the faith of his apparent title.”
It was urged in that case as in this, that the ce&tuis que trust must be presumed to know the acts and conduct of their trustee. But, replying to this view Lord Justice Turner says: “ The very-first principle of courts is, that the cestui que trust places confidence in his trustee; and if it is to be held that a cestui que trust is to be postponed upon the mere ground that he did not enquire into the acts or conduct of his trustee, that principle would be in a great measure if not wholly destroyed.” Upon this review of the cases (both American and English) I think it is clear that in this contest between holders of mere equities, that which is prior in time is prior in right, and must prevail.
But it is insisted by the learned counsel for the appellant that this rule applies only between equal equities, and if the junior claimant has a superior equity, or if he *481 has the better right to call for the legal title, he must prevail, and the case of Cox v. Romine, 9 Gratt., 28, and cases cited in the opinion of Judge Samuels, are relied on. Iu that case it is said: “It may be laid down as a general rule that between mere equities equal in all other respects, the elder shall prevail. If, however, the junior claimant shall have an advantage at law, or superior equity, such party shall prevail.” Within this exception to the rule, quiprior est tempore potior est jure, which is an exception well established, it is sought to place the appellant and his vendee Triplett. It is insisted that by the negligence and omission of the appellees, Triplett and his vendee wmre misled in paying their purchase money while there was a secret trust in favor of the sppellees, of which it was their duty to give notice.
It has already been shown that the title of the appellees was not such a title as the registry acts required to be recorded, and that therefore there was no obligation on them under those acts to make such record in any form in the county of Fauquier. The purchaser can, therefore, only claim a superior equity under that rule which declares that “the equity of a pai’ty who has been misled is superior to his who has wilfully misled him.” The meaning of this rule is, that if a person interested in an estate knowingly misleads another into dealing with the estate as if he were not interested, he will be postponed to the party misled, and compelled to make his representation specifically good. In order to the introduction of this equity it is essential that there be intentional deceit, or at all events that degree of gross negligence which amounts to evidence of an intent to deceive. Adams’ Eq., 6th Am. ed., 337, 319.
How, it cannot be said, looking to this record, that this widow and her children, who were mostly married *482 women and infants, by any act or omission of theirs, knowingly misled the purchasers in dealing with the estate in which they were interested. There is nothing in the evidence to show that they ever knew of the sale by John W. Ashby to Triplett, and by Triplett to Briscoe. They were certainly not active in any of these transactions. They were entirely passive, and their position warranted them in being so. They had submitted their rights into the hands of a court of chancery. That court had in its hands the trust funds of these cestuis que trust, and ordered its commissioner to invest these funds in the Culpeper lands; and by its decree directed that when all the purchase money was paid, the trustee, John W. Ashby, should take to himself a conveyance of that land to be held upon the same trusts as those by which the husband and father of the cestuis que trust had been careful to secure this fund to them.
They had every reason to believe that this decree would be carried out. They had every reason and right to presume that their trustee would carry out the order of the court. There was no rule of law or equity which required them to take a further step in the cause after that decree was rendered. There rvas certainly neither any necessity or propriety íd taking any action towards the assertion of their rights until the time came when the court in Culpeper was to decree a conveyance of the land. That time was w'hen all the purchase money was paid. Before that time they filed their petition asserting their claim, which was duly respected by that court. That court did not err in preferring their claim to that of the appellant and his vendor. They were purchasers of a mere equity; they purchased from a vendor who had neither the legal nor equitable title. They knew' the legal title w'as outstanding; and, in the language of Ch. J. Gibson, in Chew v. Barnett, (supra,) “in truth they *483 purchased nothiug more than a title to go into a court of chancery to have the legal estate conveyed to them;” and when they come into that court, they find they are seeking to acquire title to an estate they now know belongs to another. In the expressive language of Judge Tucker, in a case above cited, they ought to be stopped, and not permitted to proceed further in pursuit of the legal title.
I am of opinion that the decree of the Circuit court of Culpeper should be affirmed.
Anderson, Staples and Bouldin, Js., concurred in the opinion of Christian, J.
Moncure, P., concurred in the results.
Decree affirmed.